[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12230

_____

D.C. Docket No. 2:17-cr-00511-SLB-GMB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LILLIAN AKWUBA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(August 11, 2021)

Before WILSON, ROSENBAUM, and ED CARNES, Circuit Judges.

WILSON, Circuit Judge:

Defendant-Appellant Lillian Akwuba was convicted by a jury in the Middle

District of Alabama for conspiring to distribute and distributing controlled

substances, in violation of 21 U.S.C. §§ 846, 841, and conspiring to commit and committing health care fraud, in violation of 18 U.S.C. §§ 1349, 1347. Ms. Akwuba's conviction was the result of a large governmental investigation into a "pill mill" run by Dr. Gilberto Sanchez. At the time of her trial, 15 people who worked with Dr. Sanchez as doctors, nurses, and office administrators had been indicted. Two individuals had their charges dropped, and 12 others pled guilty. Ms. Akwuba was the only individual charged to proceed to trial. The district court sentenced her to 120 months in prison for each count, to run concurrently. On appeal, Ms. Akwuba raises various challenges to a jury instruction, evidentiary rulings, and the sufficiency of the evidence.

## FACTUAL AND PROCEDURAL OVERVIEW

Ms. Akwuba was convicted of issuing and conspiring to issue prescriptions for controlled substances improperly, conspiring to commit health care fraud, and committing health care fraud through her practice as a nurse practitioner (NP).[1]

Alabama law provides that an NP can prescribe controlled substances if the NP obtains a Qualified Alabama Controlled Substance Certificate (QACSC) from the Alabama Board of Medical Examiners (ABME). To obtain a QACSC, the ABME requires NPs to have a collaborative agreement with a physician. During

---

[1] Ms. Akwuba was also charged with money laundering and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1957, 1956(h). The jury found her not guilty of those counts, and they are not at issue on appeal.

the timeframe relevant to this case, Ms. Akwuba worked with four different collaborative physicians: Dr. Sanchez, Dr. Jose Chung, Dr. John MacLennon, and Dr. Viplove Senadhi. Dr. Sanchez was Ms. Akwuba's collaborative physician during her employment at his medical practice, Family Practice. Doctors Chung, MacLennon, and Senadhi were Ms. Akwuba's collaborative physicians at her own primary care practice, Mercy Family. Dr. Sanchez pled guilty and was one of the primary witnesses in the government's case-in-chief. Doctors MacLennon and Senadhi also testified as government witnesses. Dr. Chung was not called as a witness by either party.

Most of the counts Ms. Akwuba faced pertain to the time she spent working under Dr. Sanchez at Family Practice. Ms. Akwuba left Family Practice in March 2016, and one month later she formed her own medical practice, Mercy Family. Some of the patients Ms. Akwuba saw at Family Practice followed her to Mercy Family. Additional drug distribution counts relate to prescriptions she issued at Mercy Family. The drug distribution and health care fraud counts were tied to specific patients, the records of whom were presented at trial and formed the basis of the expert testimony.

The government presented expert testimony from three doctors at trial: Dr. Gary Kaufman, Dr. Robert Odell, and Dr. Gene Kennedy. Each doctor reviewed files for specific patients—including each patient's Prescription Drug Monitoring

3

Program (PDMP) report[2]—and testified to their conclusions based on those patient files. Based on the documentation made available to them, the experts concluded that the prescriptions were not issued for legitimate medical purposes. The doctors repeatedly testified that there was nothing in the available records to support diagnoses that would require controlled substances.

In response, Ms. Akwuba asserted an "incomplete records" defense. Through her own testimony and the cross-examination of government witnesses, she and her counsel raised issues regarding the patient files relied on by the expert witnesses. As Ms. Akwuba explained to the court, "part of our defense is that these records we're relying on are incomplete. And these incomplete records thus form the basis of the experts' opinions." Ms. Akwuba testified that she kept additional handwritten paper records—triage sheets or "T-sheets"—which contained her patient visit notes; if these notes were examined in addition to the electronic records, she argued, the expert witnesses could have—and should have—reached a different conclusion regarding the legitimacy of the prescriptions in question.

After 11 days of testimony, the counts were submitted to a jury and they returned a verdict of guilty for: distribution of controlled substances in violation of

---

[2] The PDMP is a database that records controlled substances that are dispensed in Alabama. PDMP records reflect what substances were actually provided to the patient through pharmacies; not just those that were prescribed. Providers can access their PDMP to see what substances a patient has received previously and for a record of how many controlled substance prescriptions all of their patients have filled.

21 U.S.C. § 841(a)(1) (Counts 2–7, 9–11, 44–48, 50–53); conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 1); health care fraud in violation of 18 U.S.C. § 1347 (Counts 15, 17, 22, 24); and conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 13). Ms. Akwuba's convictions under Counts 44–48 and 50–53, for distribution of controlled substances, arise from her time operating Mercy Family. All remaining counts pertain to her time spent at Family Practice. Ms. Akwuba was sentenced to 120 months' imprisonment on each count, to run concurrently, followed by 3 years of supervised release. Ms. Akwuba timely appealed.

## DISCUSSION

### I.    Sufficiency of the Evidence

We begin with sufficiency of the evidence, because only if the evidence is sufficient to support the jury's guilty verdicts do we have to determine whether a trial error requires reversal and remand for a new trial. *See United States v. Mount*, 161 F.3d 675, 678 (11th Cir. 1998); *United States v. Fries*, 725 F.3d 1286, 1290 n.4 (11th Cir. 2013).

We review a challenge to the sufficiency of the evidence de novo. *United States v. Hunt*, 187 F.3d 1269, 1270 (11th Cir. 1999) (per curiam). A conviction is supported by substantial evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*,

443 U.S. 307, 318–19 (1979) (explaining that "this inquiry does not require a court

to 'ask itself whether *it* believes that the evidence at the trial established guilt

beyond a reasonable doubt'").

### A. Distribution of Controlled Substances (Counts 2–7, 9–11, 44–48, 50–53)

Ms. Akwuba argues that there was insufficient evidence to support her drug

distribution convictions because the government failed to present any evidence that

the patients to whom she prescribed the controlled substances did not actually need

them. According to Ms. Akwuba, because the government did not present

testimony from a single patient that they were seeking controlled substances

without medical need, the government failed to meet its burden of proof.

It is true that the government did not present evidence regarding the patients'

necessity, or lack thereof, for the prescriptions in question. However, the

government was not required to prove this as it is not an element of the offense.[3]

We addressed a similar argument in *United States v. Ruan*, where we sustained the

---

[3] To convict Ms. Akwuba of distributing controlled substances in violation of § 841(a)(1), "the prosecution must prove that [s]he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that [s]he did so knowingly and intentionally." *United States v. Joseph*, 709 F.3d 1082, 1102 (11th Cir. 2013) (internal quotation marks omitted). "[A] distribution is unlawful if 1) the prescription was not for a legitimate medical purpose *or* 2) the prescription was not made in the usual course of professional practice." *Id.* (internal quotation marks omitted).

defendant's conviction and held that "even if [the patient] felt that she benefitted from the medications [the medical professional] prescribed, a reasonable jury could nonetheless conclude that the manner in which [the medical professional] prescribed them was outside the usual course of professional practice." 966 F.3d 1101, 1139 (11th Cir. 2020). Thus, the jury could convict Ms. Akwuba of the charged offense, even without evidence that the patients did not need the controlled substances she prescribed.

And the government did present sufficient evidence supporting each element of the drug-distribution offense Ms. Akwuba was convicted of. For example, Dr. Sanchez testified that the providers at Family Practice, including Ms. Akwuba, would prescribe controlled substances to patients who did not need them. He also testified that he questioned some of Ms. Akwuba's prescriptions for controlled substances because he thought she was prescribing patients medications at too high a dosage but would approve them because he wanted to avoid an argument. Additionally, Iesha Graham, Ms. Akwuba's extern and assistant at Mercy Family, testified that she would sometimes accompany Ms. Akwuba in the exam room while she was seeing patients. Graham explained that patients would often ask for prescription refills and that "nine times out of ten" they would ask for narcotics. Graham would take notes during Ms. Akwuba's exams, and she testified that in many cases the patient would not "really have anything wrong with them" so there

7

was not "enough information to support the prescriptions." As a result, Ms. Akwuba instructed her to go back and add information into records to justify the prescriptions.

This evidence, taken together, is sufficient to support the jury's verdict convicting Ms. Akwuba of the drug-distribution counts. We leave that decision undisturbed.

### B. Conspiracy Charges (Counts 1 and 13)

As to the conspiracy to distribute controlled substances and conspiracy to commit health care fraud counts, Ms. Akwuba argues that the evidence is insufficient to sustain her convictions because there was no agreement between the relevant parties.

To find Ms. Akwuba guilty of both of these offenses, the government was required to prove that: (1) there was an agreement between two or more people to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), or commit health care fraud in violation of 18 U.S.C. § 1347; (2) Ms. Akwuba knew about the agreement; and (3) she knowingly and voluntarily joined the agreement. *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015) (drug conspiracy); *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) (health care fraud conspiracy). For both conspiracy convictions, Ms. Akwuba was alleged to have conspired with Dr. Sanchez to commit the substantive offenses.

The evidence was sufficient to support the jury's findings that Ms. Akwuba conspired with Dr. Sanchez to distribute controlled substances and commit health care fraud. The jury heard testimony that Ms. Akwuba and Dr. Sanchez worked together to distribute controlled substances and that they directed patients to return monthly to keep up billing. To give a few examples: Dr. Sanchez testified that he pled guilty to drug distribution and health care fraud offenses, that Ms. Akwuba assisted him in issuing controlled substance prescriptions to patients who did not need them, and that Ms. Akwuba issued prescriptions to patients when she did not have the legal authority to do so.

In addition to Dr. Sanchez, the jury listened to testimony from Ms. Akwuba herself. Ms. Akwuba admitted to knowing that Family Practice billed insurance companies for her work and that Dr. Sanchez instructed her on how to document her billing. While she claimed ignorance about how the billing process worked after she finished her notetaking, the jury heard all of this testimony and was free to determine Ms. Akwuba's and Dr. Sanchez's credibility as witnesses and weigh the evidence as it saw fit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions"); *see also United States v. Tolliver*, 665 F.2d 1005, 1007 (11th Cir. 1982) (per curiam) ("This court may not assess the relative credibility of trial witnesses; that function

9

is reserved for the trier of fact."). "Moreover, a defendant can be convicted of conspiracy even if his or her participation in the scheme is slight by comparison to the actions of other co-conspirators." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (internal quotation marks omitted and alteration adopted).

Viewing the evidence in the light most favorable to the government, and leaving the jury "free to choose between or among the reasonable conclusions to be drawn from the evidence," *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007), we find that sufficient evidence supports Ms. Akwuba's conspiracy convictions.

### C. Health Care Fraud (Counts 15, 17, 22, 24)

Ms. Akwuba argues generally that the evidence was insufficient to sustain her convictions for substantive health care fraud. A person is guilty of committing health care fraud if, "in connection with the delivery of or payment for health care benefits, items, or services," she "knowingly and willfully executes" a scheme "(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347(a). In short, a defendant commits health care fraud when she knowingly "submit[s] false claims to health care benefit programs." *See Ruan*, 966 F.3d at 1142. "A person makes a false claim if the treatments that were billed were

10

not medically necessary or were not delivered to the patients." *Id*. (alteration adopted and internal quotation marks omitted).  Billing a health care benefit program for office visits where controlled substances were illegally prescribed is one way to commit health care fraud in violation of § 1347. *See id.* at 1143–44.

As an initial matter, the government concedes, and we agree, that the evidence was insufficient for Count 24. This is because Indian Nat Insurance—an entity not named in the indictment—was billed for the prescriptions pertaining to this count.

Our review of the trial record satisfies us that the government introduced sufficient evidence to support Ms. Akwuba's convictions on the remaining three health care fraud counts. As an initial matter, there was evidence that Ms. Akwuba knew that Family Practice submitted claims to health care benefit programs. The parties stipulated that:

> During the periods alleged in counts 15 and 17, the billing department of Family Practice submitted claims to the health care benefit programs described in those counts for office visits involving the patients identified in those counts.
> Defendant Lilian [sic] Akwuba was aware that those claims were submitted and participated in the submission of those claims by performing the office visits and making or causing to be made appropriate documentation in medical records that would be used by the billing department employees. The health care program subsequently paid the submitted claims as alleged in the indictment.
> During the periods alleged in the indictment, the rules and policies of the health care benefit programs described in counts 15 and 17 did not allow for those programs to pay health care providers for medically unnecessary services, including medically unnecessary office visits.

11

In addition to the stipulation, evidence showed that Ms. Akwuba knew claims were being submitted to those benefit programs for prescriptions that were not medically necessary. Government expert witness Dr. O'Dell testified that he had reviewed the files, including the controlled substances prescribed, for the patients covered by Counts 15 and 17. After reviewing the files, he concluded that the prescriptions for controlled substances issued to those patients by Ms. Akwuba were not justified by the medical records and not medically legitimate. And Dr. Sanchez testified that the providers at Family Practice, including Ms. Akwuba, would prescribe controlled substances to patients who did not need them. This testimony, along with the parties' stipulation, is enough to support Ms. Akwuba's convictions for Counts 15 and 17.

As to Count 22, the evidence is sufficient to support the jury's finding that Ms. Akwuba caused a false claim to be submitted for a prescription. The parties stipulated that Ms. Akwuba saw a patient who ultimately received prescriptions for two controlled substances. Again, Dr. O'Dell testified that he reviewed the patient's entire file, including the controlled substances prescribed, and concluded that the prescriptions were not medically legitimate. And the relevant PDMP report indicates that Dr. Sanchez wrote, and the patient filled, prescriptions for both medications, which Medicare paid for.

This evidence, taken together with Dr. Sanchez's testimony that he often signed off on prescriptions for patients Ms. Akwuba saw without ever seeing the patients himself, is sufficient to support the jury's conclusion that Ms. Akwuba caused the submission of a false claim to a health care benefit program. Sufficient evidence therefore supports Ms. Akwuba's conviction for Count 22.

* * *

To conclude, with the exception of Count 24, we find that sufficient evidence supports all of Ms. Akwuba's convictions. We accordingly affirm her convictions for distributing controlled substances (Counts 2–7, 9–11, 44–48, 50–53), conspiring to distribute controlled substances (Count 1), committing health care fraud (Counts 15, 17, 22), and conspiring to commit health care fraud (Count 13). We reverse her conviction for Count 24.

## II.    Jury Instruction

One of the witnesses in the government's case-in-chief was ABME investigator Edwin Rogers, who was assigned by ABME to investigate Family Practice. Dr. Sanchez provided records to Rogers in response to his investigation. Confusion arose at trial when Rogers testified that he had subpoenaed the records from Dr. Sanchez, and that Dr. Sanchez provided the "entire medical record" for each of the patients. The records were submitted as government exhibits. In reality,

each exhibit only contained encounter notes reflecting Ms. Akwuba's treatment; notes of visits with other Family Practice providers were omitted.

Both parties and Rogers met one night during trial to discuss the issue. The next morning, outside the presence of the jury, the government explained their meeting to the judge: "[W]e . . . asked Mr. Rogers to go back and review the entirety of the records received from Family [ ] Practice and to make sure that all of the visits within those records that reflect Ms. Akwuba having seen the patient were included in the exhibits that have been offered or admitted." The parties then submitted a stipulation to the judge and the following colloquy occurred:

> GOVERNMENT[4]: Your Honor, there is one thing. One point that the parties did not agree on the stipulation, but the government asks the Court to also . . . advise the jury that the defendant has access to the totality of the records or all of the records from Dr. Sanchez's practice were made available to the defendant.
>
> THE COURT: I think that's important.
>
> DEFENSE COUNSEL: The reason I didn't agree to it, Judge, is because in my opinion, it creates—to make that statement creates the impression to the jury that the defense has some type of obligation to present a defense or present evidence to the jury, and that's just not the case here. It's the government's burden of proof, as the Court is well aware.
>
> THE COURT: That's true. That's true, but it—I don't want them left with the impression they're hiding things. They have the burden of proof.

---

[4] For clarity, the names of trial counsel have been omitted from the transcript excerpts and replaced with "GOVERNMENT" and "DEFENSE COUNSEL."

DEFENSE COUNSEL: Well, I object to that—that amendment to the—we agreed to what's in front of you, Your Honor.

THE COURT: I understand. Okay. So I am going to add all of each patient's—I'm going to read it and then I'm overruling your objection, but then I'm going to read what I write.

. . . .

THE COURT: . . . I'm going to also—I'll add at the end, all of each patient's records were provided to defendant and her counsel—all of each patient's records from . . . Family [Practice].

. . . .

THE COURT: None of these records were from her own—the Mercy [Family]? None of these were from that one?

GOVERNMENT: That's correct, Your Honor.

THE COURT: All of each patient's records from Family Practice were provided to the defendant and her counsel prior to trial. Okay. All right. And so for the record, I'm overruling that objection.

DEFENSE COUNSEL: Yes, ma'am.

The jury then entered the courtroom, and the judge gave the following instruction:

THE COURT: All right. I want to give you-all a written instruction. At the end of the presentation of the evidence yesterday, there was some confusion regarding some answers given by Investigator Edwin Rodgers [sic] of the [ABME]. In order to clear up this confusion, the parties have agreed that the following is true:
Government's Exhibit 2-B, 3-B, 5-B, 6-B, 7-B, 8-B, 9-B, and 10-B are patient care summaries. These exhibits summarize the care the patient received at Family Practice.
The other items in Government's Exhibits, sets 2 through 10, are encounter notes. The encounter notes admitted into evidence in this trial are only the encounter notes describing office visits involving the defendant, Lilian [sic] Akwuba.

15

> Government's Exhibits 2 through 10 contain every record obtained by the [ABME] from Family Practice relating to each and every office visit involving Ms. Akwuba. The encounters not involving Ms. Akwuba are not included in the government's exhibits. *All of each patient's records from Family Practice were, however, provided to defendant and her counsel prior to trial.*

(emphasis added). The last sentence—"All of each patient's records from Family Practice were, however, provided to defendant and her counsel prior to trial"—was added by the judge, and was *not* part of the agreed-upon stipulation. Defense counsel did not renew its objection to the stipulation in the presence of the jury.

On appeal, Ms. Akwuba argues that the district court violated her rights to a jury trial and due process by instructing the jury on a disputed fact—that she had been given all of the records from Family Practice. She asserts that the court's erroneous instruction constitutes reversible error because it amounts to a partial directed verdict, and therefore cannot be harmless. *See United States v. Goetz*, 746 F.2d 705, 709 (11th Cir. 1984) ("[A] trial court's actions in directing a verdict in a criminal trial, either in whole or in part, cannot be viewed as harmless error."). Ms. Akwuba also contends that the court improperly instructed the jury that a central aspect of Ms. Akwuba's defense was factually untrue, violating her right to present a complete defense.

The government counters that the court did not err in instructing the jury about what records the government received from ABME, nor did the court's

16

clarifying instruction about the Family Practice files affect Ms. Akwuba's substantial rights. Taking the instruction in context, as this court must do on appeal, *see Jones v. United States*, 527 U.S. 373, 391 (1999), the final sentence of the instruction pertains to the government's exhibits and the Family Practice files it received from ABME—it did not direct the jury's verdict on an element of any offense, or even negate Ms. Akwuba's defense. Ms. Akwuba was still able to put forth her "missing records" defense through multiple witnesses, the government argues, including her own testimony that she created paper records that Family Practice did not provide to ABME. The jury could therefore reasonably conclude that any additional paper files, if they existed, would not have made a difference.

### A. Directed Verdict

"Jury instructions properly challenged below are reviewed *de novo* to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." *United States v. Felts*, 579 F.3d 1341, 1342 (11th Cir. 2009) (per curiam). "A trial court has a wide latitude in commenting on the evidence during his instructions to the jury, but he has no power to direct a verdict of guilty." *Mims v. United States*, 375 F.2d 135, 148 (5th Cir. 1967).[5] To rise to the level of a directed verdict—and constitute constitutional error—the trial judge's

---

[5] All decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

17

statements, viewed as a whole, must "amount to [an] intervention which could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *United States v. Abrams*, 568 F.2d 411, 423–24 (5th Cir. 1978).

As an initial matter, while the court instructed the jury on a fact question, the court's instruction does not amount to a directed verdict because it does not relate to an *element* of any offense Ms. Akwuba was charged with. *See Goetz*, 746 F.2d at 708 (finding that a trial judge invades the province of the jury and violates a defendant's constitutional right to a jury trial when the judge directs "a verdict in favor of the government for all or even one element of a crime"). Due process guides what the factfinder must determine in order to return a guilty verdict. "The prosecution bears the burden of proving *all elements of the offense charged* and must persuade the factfinder 'beyond a reasonable doubt' of the *facts necessary to establish each of those elements*." *Sullivan v. Louisiana*, 508 U.S. 275, 277–78 (1993) (emphases added) (citations omitted). Not only did the court's instruction not go to an element of any of the offenses Ms. Akwuba was on trial for, it did not relate to any question of fact that the jury was required to determine. Consequently, no question of fact necessary to establish the elements of the crimes Ms. Akwuba was charged with was taken out of the jury's hands. The district court's instruction, therefore, does not amount to a directed verdict. *See Goetz*, 746 F.2d at 708.

18

## B. *Right to Present a Defense*

While the court's instruction does not amount to a directed verdict, that does not mean the instruction was without error. Whether the instruction violated Ms. Akwuba's constitutional right to present a defense is a closer question.

"We review the legal correctness of a jury instruction de novo but defer on questions of phrasing absent an abuse of discretion." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted). We will reverse a conviction due to an erroneous jury instruction only "when the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *United States v. Abovyan*, 988 F.3d 1288, 1308 (11th Cir. 2021) (internal quotation marks omitted). "We must have a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations before reversing a conviction on a challenge to the jury charge." *Id.* (internal quotation marks omitted). Because district courts have wide discretion in the phrasing of instructions, "[w]hen a jury instruction accurately expresses the applicable law, there is no reason for reversal even though isolated clauses may . . . be confusing, technically imperfect, or otherwise subject to criticism." *United States v. Gonzalez*, 834 F.3d 1206, 1222 (11th Cir. 2016).

"The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States v. Mitrovic*, 890 F.3d 1217, 1221

(11th Cir. 2018) (alteration adopted) (quoting *Nevada v. Jackson*, 569 U.S. 505, 509 (2013)). However, we have recognized that this right "is not absolute, and is subject to reasonable restrictions." *Id.*

In *United States v. Hurn*, we explained that two considerations are appropriate in analyzing a defendant's claim that his constitutional right to present a defense was violated: (1) whether the right was "actually violated," and (2) if so, "whether [the] error was 'harmless beyond a reasonable doubt.'" 368 F.3d 1359, 1362–63 (11th Cir. 2004). "[I]f the court permits a defendant to present the essence of [her] desired argument to the jury, [her] right to present a complete defense has not been prejudiced." *United States v. Harris*, 916 F.3d 948, 959 (11th Cir. 2019).

Here, the district court was unquestionably wrong to instruct the jury that the parties stipulated to something that they did not stipulate to. While we easily conclude that the instruction was erroneous, we are not convinced that the error rises to the level of a constitutional violation. Importantly, Ms. Akwuba was not prevented from presenting her theory of defense to the jury. *See id.* Both Ms. Akwuba and her trial counsel had ample opportunity to present the defense both before and after the contested instruction was given, choosing to speak to the defense at certain points—during direct and cross-examination of expert witnesses and Ms. Akwuba—and choosing to not address it at others—during the defense's opening statement. For example, Ms. Akwuba was still able to put forth her

missing records defense in her closing statement and through multiple witnesses, including her own testimony that she created paper records that Family Practice did not provide to the AMBE (and, therefore, were not part of the trial record).

Examining the jury instruction in context, we are not left with "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations," *Abovyan*, 988 F.3d at 1308, and therefore affirm as to this issue.

## III.    Evidentiary Rulings

Finally, Ms. Akwuba appeals three evidentiary rulings made by the district court. We first address the applicable standards of review for such challenges, then turn to each issue raised on appeal.

As a practical matter, it is often difficult for a litigant to persuade a court of appeals to reverse a district court's ruling on discovery issues given the limited nature of our review. *See United States v. Brown*, 415 F.3d 1257, 1264–65 (11th Cir. 2005). All evidentiary rulings are reviewed for an abuse of discretion. *Id.* "The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989). Because "[w]e recognize a significant range of choice for the district court on evidentiary issues," our review of such rulings is very limited and "we defer to [the district court's] decisions to a considerable extent." *Brown*, 415 F.3d at 1265. The district

court is afforded this deference because its "role in presiding over trial proceedings means [it] is in the best position to decide the matter." *Id.* ("Being at the trial as the proceedings occur and the evidence unfolds, a trial judge has an advantageous familiarity with the proceedings and 'may have insights not conveyed by the record' about the evidence and the issues relating to it.").

Our deference to the district court's evidentiary rulings is even greater when they are contested for the first time on appeal. Under such circumstances, we review only for plain error. *See United States v. Clotaire*, 963 F.3d 1288, 1292 (11th Cir. 2020). Plain-error review "provides a court of appeals a limited power to correct errors that were forfeited." *United States v. Olano*, 507 U.S. 725, 731 (1993). Such "review should be exercised sparingly, and only in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (internal quotation marks and citation omitted).

We may not correct an error that the defendant failed to raise in the district court unless there is: "(1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights." *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015) (per curiam). "If we find that these conditions are met, we may exercise our discretion to recognize a forfeited error, but only if the error seriously affects

the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration

adopted and internal quotation marks omitted).

## A. *Exclusion of Prescription Pad Evidence*

At trial, Ms. Akwuba sought to testify that a prescription pad bearing the

name of one of her collaborative physicians, Dr. Senadhi, had been stolen from

Mercy Family and used to issue false or fraudulent prescriptions. The prescription

pad was brought up during the direct examination of Ms. Akwuba:

> DEFENSE COUNSEL: Was there a time when you were running Mercy, right before—well, prior to Mercy closing down, that you had an issue with a missing prescription pad?
>
> AKWUBA: Yes.
>
> DEFENSE COUNSEL: Can you tell the jury about that and what its significance is to this case?
>
> GOVERNMENT: Objection.
>
> THE COURT: Hold on one second. Don't answer. Let me see you-all.

The following then occurred at sidebar:

> THE COURT: I need to know where you're going with this and what it's relevant to.
>
> DEFENSE COUNSEL: I have to be perfectly frank with the Court. I do not know. [Ms. Akwuba] asked me to ask these questions. She gave me a list of questions she wanted me to ask her this morning, and this is one of these questions. I don't know where it's going. That's my honest answer, Judge.

The district court refused to allow Ms. Akwuba to present this evidence unless she was able to show that some of the prescriptions Dr. Senadhi had described as forged were from this incident. The court then gave Ms. Akwuba and her counsel some time to go through the prescription records.

> DEFENSE COUNSEL: I have received from the government a list of all the prescriptions in this case. I've identified three that could be related to the testimony that Ms. Akwuba was giving before the break.
>
> We have looked in the files. All three of those possible prescriptions that might relate to that testimony do—there is a corresponding office visit that relates to each one of those possible prescriptions. So I will withdraw that line of questioning at this time.

Ms. Akwuba's testimony then continued about other matters.

Ms. Akwuba argues on appeal that the district court abused its discretion in preventing her from introducing evidence that Dr. Senadhi's prescription pad had been stolen. She argues that the evidence was relevant and should have been admitted. At trial, Dr. Senadhi testified that his PDMP report for the year he acted as her collaborative physician listed 130 pages of narcotic prescriptions—as opposed to an average of nine pages for the preceding three years—and described it as an "atrocity." According to Ms. Akwuba, the testimony that she sought to introduce would have rebutted the implication that she was responsible for all 130 pages of prescriptions, and thus the district court committed reversible error in prohibiting this testimony. The government counters that the district court properly excluded irrelevant evidence; if the defense wanted to introduce this information, it

24

should have done so through the cross-examination of Dr. Senadhi, not by attempting to admit hearsay upon hearsay through Ms. Akwuba's testimony.

\*      \*      \*

Only relevant evidence is admissible at trial. *See* Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

While it is not clear whether this issue was properly preserved for appeal, we find no error by the district court when reviewing for either an abuse of discretion or plain error. The court gave Ms. Akwuba an opportunity to look through the records to see if any prescriptions issued from the stolen prescription pad were attributed to her. Once defense counsel told the court that there was not an issue, the line of questioning about the stolen pad became irrelevant and inadmissible. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). This fact seems to have been acknowledged by defense counsel, who subsequently withdrew the line

25

of questioning. Accordingly, the district court properly excluded the presentation of irrelevant testimony, and we affirm.

### B. Cross-Examination of Dr. Kaufman

The next issue we address concerns the testimony and cross-examination of one of the government's expert witnesses, Dr. Kaufman.

While investigating and prosecuting this case, the government had also sought Dr. Kaufman's opinion regarding one of the other indicted Family Practice employee's prescriptions. This former co-defendant, who still had access to her handwritten paper records, was able to provide those additional records to Dr. Kaufman, who, in turn, changed his opinion as to the validity of the prescriptions. This incident was brought up during a break from the direct examination of Dr. Kaufman, when the government told the court that there is a legal "issue related to Dr. Kaufman's cross-examination that we anticipate." After the jury and witness left the courtroom, the government identified its concern:

> GOVERNMENT: As I expect will come out, Dr. Kaufman reviewed files, not only related to Ms. Akwuba, but . . . a host of other folks who worked at Family Practice.
>
> . . . .
>
> GOVERNMENT: One of the nurse practitioners who was indicted, a codefendant of Ms. Akwuba—now, that nurse practitioner worked at Family Practice—really, she was Ms. Akwuba's replacement. She came in after Ms. Akwuba. They did not—they didn't really overlap in the practice.

The nurse practitioner, . . . before she pled guilty, she came forward with her own T sheets. And she said, look, Kaufman didn't have these T sheets. If he had these T sheets, his opinion would be different.

So she gave them to her lawyer. The lawyer gave them to us. We gave them to Dr. Kaufman. Dr. Kaufman looked at them and then sends an email back . . . saying, I've reviewed the T sheets that were provided by . . . th[e] defendant. And to some extent, that does change my opinion to some of the care. Not as to other. It did cause me to change my opinion as to certain prescriptions.

Obviously, that was turned over to [defense counsel] as a witness statement in this case, and I think that [defense counsel] wishes to cross-examine Dr. Kaufman about that email that he sent. . . .

THE COURT: Let me hear from you, [defense counsel].

I know your argument here has been they're all these paper records, and that we—but we don't have those paper records, and we don't have the paper records with regard to your client. So to me, the fact that someone else brought it in and changed his opinion as to that particular defendant does not apply here.

You know, if you saw other records, well, he needs—I mean, that's within your control.

DEFENSE COUNSEL: It's absolutely not within our control, Your Honor. Ms. Akwuba did not work at Family Practice during the time that these subpoenas were sent out and responded to. She didn't have any control over these records once she left that employment.

I don't intend to use that particular email unless Dr. Kaufman says that he would not change his mind, regardless of what he saw in this case. I instead—I do intend to ask him if he saw additional records in this case, like T sheets or other types of items, would have potential to change his opinion. If he says no, then I do not intend to use that email to impeach him with that.

THE COURT: All right. I think that's fair.

27

After this colloquy, the government continued the direct examination of Dr. Kaufman. The next morning, Ms. Akwuba attempted to cross-examine Dr. Kaufman about, among other things, the fact that his expert opinion about the validity of the prescriptions could change if he reviewed additional records. Specifically, defense counsel cross-examined Dr. Kaufman about changing his opinion in this case after he received additional records from Family Practice:

> DEFENSE COUNSEL: If there had been more information located in these files, would it possibly have changed your opinion on one or more of the issues that were raised in . . . your testimony earlier?
>
> THE COURT: Overruled.
>
> DR. KAUFMAN: I gave my opinion based upon what I reviewed, and I really—sure. If there's extra things that completely change my opinion, I would change my opinion. But based upon what I was given, what I saw, that was my opinion.
>
> . . . .
>
> DEFENSE COUNSEL: Have you ever changed your opinion in a case based on additional information that was given to you?
>
> GOVERNMENT: Objection, Your Honor.
>
> THE COURT: Overruled.
>
> . . . .
>
> DR. KAUFMAN: I haven't received any additional information, the basis for changing my opinion.
>
> DEFENSE COUNSEL: Have you reviewed other people that were involved in this case—have you reviewed records for other people that were charged in this case?

28

DR. KAUFMAN: Yes, I have.

GOVERNMENT: Objection, Your Honor. This case involves Ms. Akwuba.

At this point, the judge asked to see counsel at sidebar, during which the following occurred:

THE COURT: So he has said that he—his mind can be changed when other records are provided. He was not provided any more records in this case.

DEFENSE COUNSEL: Yes, ma'am.

THE COURT: He was provided some in the other case, and he wrote that it possibly changed his opinion, which he's just said that he could do. So there's nothing to impeach him with, because he never got any more records in this case against this defendant.

GOVERNMENT: And I would note for the record that what [defense counsel] is referring to are the records that actually came from the defendant in that other instance. So the defendant provided the records to the expert.

THE COURT: Okay. And so he did say—he admitted that his mind could be changed when he reviews additional records. So I don't think he said anything that could be impeached by his email or his changing of the testimony in the other case.

DEFENSE COUNSEL: All right. I can move on.

*    *    *

There is some debate in the parties' briefs about whether this issue was properly preserved for appeal in order to warrant abuse-of-discretion review. However, because Ms. Akwuba's arguments have shifted on appeal—and she did not object below—we review only for plain error. *See Clotaire*, 963 F.3d at 1292.

29

After Dr. Kaufman admitted to changing his opinion in the past based on additional information, the court halted Ms. Akwuba's cross-examination and brought the parties' counsel to sidebar. The court reasoned that Dr. Kaufman said "his mind can be changed when other records are provided. . . . So there's nothing to impeach him with." Defense counsel did not seek to continue this line of questioning.

The district court did not err by deciding to end the line of questioning, let alone commit a plain error that affected Ms. Akwuba's substantial rights. *See Hesser*, 800 F.3d at 1324. The decision by the district court to end that line of questioning does not rise to the level of plain error: it was reasonable for the court to conclude that any further questioning as to this point was irrelevant, and therefore inadmissible, as it did not pertain to the defendant. Defense counsel was able to elicit testimony from Dr. Kaufman that his opinion *could* change if he saw additional records, and therefore there was no need to impeach him. Because this evidentiary ruling does not amount to a "circumstance[] in which a miscarriage of justice would otherwise result" absent reversal, it does not constitute plain error. *See Rodriguez*, 398 F.3d at 1298. We therefore affirm the district court as to this issue.

## C. Admission of Expert Testimony

30

Ms. Akwuba objects to testimony from four experts on appeal: Debra O'Neal Davis, an NP who testified about nurses' professional obligations when prescribing controlled substances; and Doctors Kaufman, O'Dell, and Kennedy, who reviewed Ms. Akwuba's patient files and testified about whether her controlled substance prescriptions were issued for a legitimate medical purpose or within the usual course of practice. She did not object to any of this testimony at trial.

Ms. Akwuba argues that the district court erred by allowing expert testimony pertaining to (1) whether she prescribed controlled substances without a legitimate medical purpose, and (2) the experts' own professional practices. She asserts that whether there was a legitimate medical purpose for the prescriptions is a subjective inquiry; therefore, any direct testimony about whether there was a legitimate purpose was direct commentary on Ms. Akwuba's intent in issuing the prescription. This type of testimony, she argues, is prohibited by Federal Rule of Evidence 704(b) and *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988) ("[An] expert cannot expressly state a conclusion that the defendant did or did not have the requisite intent."). As for the testimony about the experts' own practices, Ms. Akwuba argues that it was irrelevant because the standard of criminal liability under § 841 is "knowingly or intentionally"—not what one doctor does or does not do in his or her own practice. 21 U.S.C. § 841(a)(1).

\*　　\*　　\*

The intent element for unlawfully distributing a controlled substance is "knowingly or intentionally." 21 U.S.C. § 841(a)(1). Prescriptions for controlled substances are lawful if they are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). "But Rule 704(b) does not preclude even expert testimony that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on this ultimate issue, and instead leaves this inference for the jury to draw." *United States v. Caniff*, 955 F.3d 1183, 1195 (11th Cir. 2020) (per curiam) (internal quotation marks omitted).

We begin our analysis by "[r]ecognizing that our review of evidentiary rulings by trial courts on the admission of expert testimony is 'very limited.'" *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). This is especially true when, as here, the ruling was not objected to below and the appellant argues that the district court's decision amounts to plain error. *See Clotaire*, 963 F.3d at 1292

We have no problem concluding that the experts here did not impermissibly state opinions regarding Ms. Akwuba's mental state. In fact, we referenced similar expert testimony to uphold a defendant's convictions under 21 U.S.C. § 841(a)(1) in *United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013). In finding that sufficient evidence supported the defendant's convictions in *Joseph*, we acknowledged that "[b]oth the prosecution and the defense . . . presented the jury with substantial expert testimony about the applicable standard of professional conduct." 709 F.3d at 1103–04. To support our conclusion, we noted that the government's expert "testified that there was no legitimate medical reason to prescribe many of the combinations of drugs that [the defendant] prescribed for his patients." *Id.* at 1104.

Ms. Akwuba's reliance on *Alvarez* is also misguided. In *Alvarez*, we held that "[e]xpert testimony expressly stating an opinion as to the defendant's state of mind at the time of the offense is barred by [R]ule 704(b)." 837 F.2d at 1031.

33

There, an expert witness testified that "it would be unlikely crew members aboard a vessel carrying a large quantity of contraband would be unaware of its presence." *Id.* While the "obvious inference" was that the defendants knew about the contraband, we concluded the testimony did not violate Rule 704(b) because the expert "did not expressly 'state the inference.'" *Id.* (alteration adopted). Similarly, the experts here did not expressly state an opinion as to Ms. Akwuba's intent, but rather "left this inference for the jury to draw." *Id.* The district court therefore did not err in admitting this testimony.

Although the admission of the expert testimony about the experts' personal practices presents a closer call, it still does not rise to the level of plain error. "We will not overturn an evidentiary ruling and order a new trial unless the objecting party has shown a substantial prejudicial effect from the ruling." *United States v. Barton*, 909 F.3d 1323, 1330–31 (11th Cir. 2018) (internal quotation mark omitted). "Substantial prejudice goes to the outcome of the trial; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *Id.* (internal quotation mark omitted). While the experts occasionally remarked about their own practices—and such remarks are likely irrelevant—those remarks were not the main, or even a substantial, focus of their testimony. Additionally, the government correctly points out in its brief that the court instructed the jury as to what was and was not at issue,

34

the findings the jury would have to reach to convict, and what findings would *not* be sufficient to convict, thereby curing any potential confusion amongst the jury regarding the mens rea requirement.

Thus, even if there was any error, the court's instructions about the applicable law and the standard of criminal liability cured any confusion and Ms. Akwuba has not met her burden of demonstrating any error amounts to a plain error that affected her substantial rights. *See Hesser*, 800 F.3d at 1324. Therefore, because Ms. Akwuba has not proven that any error in admitting this testimony—if one exists—resulted in substantial prejudice, we affirm the district court.

## IV. Cumulative Error

Ms. Akwuba also asserts that the cumulative prejudice from the errors she identified requires reversal. *See United States v. Azmat*, 805 F.3d 1018, 1045 (11th Cir. 2015) ("Under the cumulative-error doctrine, we will reverse a conviction if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless."). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013).

The problem for Ms. Akwuba is that "there are no errors to accumulate." *Azmat*, 805 F.3d at 1045. True, we found that the district court erred by instructing

35

the jury that the parties had stipulated that "[a]ll of each patient's records from Family Practice were, however, provided to defendant and her counsel prior to trial." But that is the only error the district court made.

Even if we assume that the district court made some additional evidentiary errors, Ms. Akwuba has failed to "demonstrate, or offer any explanation, for how the aggregate effect of these errors substantially influenced the outcome of [her] trial." *Capers*, 708 F.3d at 1299. As we explained earlier, any errors the district court made hardly prejudiced Ms. Akwuba on their own. For example, even with respect to the jury instruction error, Ms. Akwuba still had ample opportunity to present her incomplete records defense during her cross-examination of government witnesses and her closing argument. Because Ms. Akwuba was still able to fully present her defense, any small additional evidentiary errors would not be enough, even in the aggregate, to affect her substantial rights. Thus, Ms. Akwuba's cumulative error claim must fail.

## CONCLUSION

In conclusion, we reverse Ms. Akwuba's conviction for health care fraud under Count 24. We affirm the remainder of her convictions and the district court's evidentiary rulings. With regards to the contested jury instruction, we find no plain error affecting Ms. Akwuba's substantial rights, and thus affirm.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**