[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13733

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

RICHARD FRANKLIN JENSEN, III,
a.k.a. Frank,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cr-00068-SCB-TGW-1

_____

Before JORDAN, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Richard Jensen was convicted at trial of attempting to entice a minor, in violation of 18 U.S.C. section 2422(b), and attempting to transfer obscene material to a minor, in violation of 18 U.S.C. section 1470. On appeal, Jensen challenges the district court's exclusion of chat evidence supporting his roleplay defense theory, as well as the jury instructions. After careful review, we affirm his convictions.

## FACTUAL BACKGROUND

Motherless.com is a website where users can send each other messages and pictures about their various nontraditional sexual interests. Department of Homeland Security Special Agent Terri Lynn Botterbusch had a profile on the site so she could catch people seeking children for sex. Under the username "Rachelb," she pretended to be a "family fun"-loving, "open minded" mother named "Rachel," with a twelve-year-old daughter named "Nicky."

Under his username "Hotdirtystud," Jensen messaged "a lot of different users" on Motherless.com about various deviant sexual interests. His profile bio said that he was interested in sexually "taboo," "kinky," and "dirty" topics.

On May 23, 2015, Jensen began chatting with "Rachel." He said that he loved "role play and playing fun, naughty games with younger partners," and that his sexual interests were many and

"depend[ed] on and varie[d] with the age and experience of [his] partner." When "Rachel" said she was looking for an experienced man to teach "Nicky" about sex, Jensen responded that he was "definitely open to doing that" and that it "sound[ed] like it would be a great experience for both of [them]." He said he had "taught" and "trained" two other girls "in the art of pleasing a man" and was a "very good teacher" who would "go slow" and make "Nicky" "feel comfortable."

Jensen suggested that they move their conversation to another chat platform because Motherless.com "frowned upon" what they were discussing, but he kept using the site to message "Rachel." He said he had "some really good ideas that would be great to get things started." He wanted to make arrangements "in the next month or so." Jensen proposed approaching "Nicky" as "mommy's friend" and babysitting her for a few days. He assured "Rachel" that he planned to make "Nicky" "feel good" during sex. As to the frequency of his expected encounters with "Nicky," Jensen explained that "it couldn't be a one-time thing" because "[g]irls form attachments to a guy they have their first experiences with, and [Jensen] wouldn't feel right just spending a few days or a week with her [and] then leaving and not seeing her again." He also wanted "Nicky" to have a way to communicate with him and see him again after their sexual encounter.

Jensen sent "Rachel" a photo of his face and his reflection in a mirror showing his naked back and behind, and he asked for a photo of "Nicky." "Rachel" gave Jensen her Gmail address and

Jensen emailed her to introduce himself (as "Frank"). Jensen asked for more information about "Nicky" and for "a pic or two of her." "Rachel" said that "Nicky" liked his photo and asked for more photos of him. She sent Jensen three photos of "Nicky": two face shots and one of her practicing gymnastics in a leotard. Jensen replied that he couldn't wait to meet "Nicky" and get to know her "very intimately." He told "Rachel" that "Nicky" had "a very sexy body in the gymnastic pic," and he "would like to see more of it if ['Nicky'] want[ed] to share some sexier pics with [him]."

Jensen kept asking for photos of "Nicky" and discussing his detailed plans to meet her in Tampa for their sexual "train[ing]." On June 1, 2015, "Rachel" asked him if he sent pictures of himself "for Nicky," and Jensen in response attached six photos and offered to "send ['Nicky'] more" if "Nicky" wanted. Two of the photos depicted Jensen clothed, one showed his face and upper body as he flexed, and three displayed Jensen's erect penis. That same day, Jensen emailed "Nicky" directly to introduce himself before his visit.

Jensen then asked "Rachel" for more pictures of "Nicky" "in a bikini or just bra and panties" and for a photo of "Rachel" and "Nicky" together to verify their identities and relationship. "Rachel" asked Jensen if he was "having second thoughts," and he replied that he was not and "definitely want[ed] to do this." Jensen asked if the next week would be too soon to get started.

Jensen texted "Nicky" at her direct phone number and wrote, "I may be coming down to see you next week so we can

have fun together and start teaching you about sex." He described how he would "show [her] and teach [her] all about [his] penis" and the "things guys can do to girls to feel good." He also told "Rachel" in graphic detail about what he planned to do with "Nicky."

Eventually, Jensen said he needed "Nicky" to appear naked on a webcam "for [his] own protection" because the sexual "train[ing]" they were planning was "very illegal." He reasoned that a law enforcement officer would have to refuse. When "Rachel" refused, Jensen protested that he was taking a "huge risk." After she held firm, he apologized and promised to book his flight that day.

On the morning of June 4, 2015, Jensen again acknowledged that what he was planning was "very illegal," but he was "very happy and willing to do it." But, less than a half hour later, he contacted "Rachel" with a surprising claim. Jensen said that his messages had been "just fantasy play" and he was not sexually interested in young girls; rather, he had known all along that there was no real child. Later that day, Jensen called Agent Botterbusch's office and cell (as himself, not "Frank") and left a voicemail for the agent (not "Rachel") claiming that he was "a researcher and author and attorney in Atlanta . . . working on a book." His messages, he said, had just been research. Jensen asked if he could interview her for the book and if she would return his call. At trial, Jensen conceded that there was no book.

Agent Botterbusch returned Jensen's call and recorded the conversation. Jensen told her that he had uncovered her true

identity when he performed a "reverse image search" on her photos and found a newspaper article about a previous child-exploitation case that identified her by name.

The police searched Jensen's home in Atlanta and seized his computer and smartphone. An analysis of the devices showed that Jensen used the computer to visit pornographic webpages on Motherless.com with names like "[t]een sibling incest," "[d]addy breeding," and "[f]ather daughter anal sex." Jensen used the smartphone to visit profiles on Kik, a chat application often used to "trade child pornography" and contact children for purposes of child-exploitation. The Kik profiles Jensen visited appeared to belong mainly to young girls.

At trial, Jensen testified that his chats with "Rachel" were just a type of roleplay called "age play," in which an adult pretends to be a child. He said that he used Motherless.com to have "fantasy chats" with people about "deviant" sexual topics like incest, rape, urination, defecation, bondage, sadomasochism, and sex with children. Jensen maintained that he had no sexual interest in children and knew all along that "Nicky" was not a real child. To corroborate his roleplay defense, Jensen entered into evidence detailed chats between him and another user on Motherless.com in which he described an incestuous encounter he had as a child with his sister and cousin. Jensen's sisters testified that the alleged incest never happened.

## PROCEDURAL HISTORY

*The Midtrial Bench Conferences About the Chat Evidence*

The main issue in this appeal involves a chat log that Jensen tried to get into evidence. The forty-four-page chat log contained over a hundred chats between Jensen and other Motherless.com users, including "Rachel." It also included the incest chats admitted during Jensen's defense case. Most of the chats were sent in May 2015.

On the first day of trial, the government sought to admit a list of every webpage on Motherless.com that Jensen had visited. Jensen argued that if the webpage list was admitted, the rule of completeness required the district court to also admit the chat log. The district court reserved ruling on both evidentiary issues.

On the second day of trial, after the government admitted screenshots from "Rachel's" Motherless.com profile, a Motherless.com chat from Jensen to "Rachel," and the transcript of the recorded call between Special Agent Botterbusch and Jensen, Jensen argued that those exhibits opened the door to introducing the chat logs during the agent's cross-examination. The government responded that the rule of completeness did not apply, and that the chats were hearsay. Jensen replied that the chats weren't hearsay because he offered them to show his state of mind. Jensen also argued that the exclusion of the chats would prohibit him from presenting his defense theory (which he had not disclosed by this point of the trial).

The district court concluded that the chats weren't admissible under the rule of completeness and were hearsay. The district court told Jensen that it needed more information about his defense theory before it could determine whether the state of mind hearsay exception applied. Jensen could testify about the chats, the district court said, and attempt to introduce them during his case-in-chief. Jensen gave the district court the chats during the bench conference, but took them back when it was over.

On the third day of trial, before Jensen's sisters testified, he told the district court that he planned to ask them about the chats. The government objected that the chats were hearsay and were also "unfairly prejudicial" and "extremely confusing" under Federal Rule of Evidence 403. In response, Jensen "let the cat out of the bag" and disclosed his roleplay defense theory. He argued that "[a]ll his chats and things that he was doing" online showed he was just "looking to role[]play" and "was not looking to have sex with a [twelve]-year-old girl." Jensen said his sisters would testify that the alleged incest never happened, which would undermine the government's proof of his intent and rebut the government's rule 404(b) evidence (the pornographic webpages Jensen looked at on Motherless.com and the profiles of minors that he viewed on Kik).

The district court ruled that Jensen could ask his sisters about the incestuous activities, but if the defense wanted to introduce the chats they would have "to come in through" Jensen himself. The district court reserved ruling on whether the chats were admissible through Jensen. As before, Jensen gave the district court

the chats during the bench conference, but took them back when it ended.

Finally, on the fourth day of trial Jensen sought to admit all of the chats, arguing that they corroborated his "theory of the case" and showed he was just engaging in a "fantasy." The district court allowed into evidence the incest chats discussed above, but excluded the rest of the chats because they were hearsay, because performing a hearsay analysis on each chat to determine whether the state of mind exception applied would take too long, and because some of the chats weren't in the same "time frame" as Jensen's chats with "Rachel." The district court said that if Jensen had turned over the chats earlier, it "might have been able to go through [them] and say what was admissible and what was not." Jensen responded that he had provided the district court with the chat logs earlier during the previous bench conferences. The district court explained that it didn't have a chance to inspect every chat because Jensen had taken the chat logs back.

### The Charge Conference

Jensen was indicted on two counts. Count one charged him with "using a facility and means of interstate commerce, that is, a computer," to attempt to entice a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. section 2422(b). And count two charged him with "using any means or facility of interstate commerce, that is, a computer," to attempt to transfer obscene material to a minor, in violation of 18 U.S.C. section 1470.

At the charge conference, the district court addressed the government's proposed jury instructions.  The instructions identified a "cellular telephone" and "the Internet"—and not a "computer"—as the facilities of interstate commerce for both counts.  The instruction also said that, as to count one, the government had to prove that Jensen "intended to engage in some form of unlawful sexual activity with [a minor] and knowingly took some action that was a substantial step toward bringing about or engaging in that sexual activity."

The district court "[ran] through [the instructions] one at a time" with the parties.  The district court then asked Jensen's counsel whether he "had an opportunity to look at the instructions."  Counsel replied:  "I have.  No objection."  The final jury instructions were consistent with the government's proposed jury instructions.

The jury convicted Jensen of attempted enticement of a minor and attempted transfer of obscene material to a minor.  Jensen was sentenced to 151 months' imprisonment for count one and a concurrent 120 months' imprisonment for count two.  This is his appeal.

## DISCUSSION

Jensen brings three claims on appeal.  First, he argues that the district court abused its discretion when it excluded the Motherless.com chat logs.  Second, Jensen maintains that the exclusion of the chats violated his constitutional right to present a defense.

And third, he contends that the district court plainly erred as to the jury instructions when it constructively amended the interstate commerce element for both counts and misstated the intent and substantial step elements for count one.

### The Excluded Chat Evidence

Jensen argues that the district court abused its discretion by excluding the chat logs he wanted to use to bolster his roleplay defense. This was error, he maintains, because the chats either "were not hearsay" or, if they were hearsay, satisfied the "state of mind" hearsay exception.[1] Jensen also argues that because he tried several times to get the chats admitted into evidence during the midtrial bench conferences, there was "no reason for the district court to refrain from reviewing" the chats "one at a time" to determine their admissibility.

We assume, without deciding, that the district court erred in excluding the chats. But "[e]ven if the ruling was an abuse of discretion, it will not result in a reversal of the conviction if the error was harmless." *United States v. Docampo*, 573 F.3d 1091, 1096 (11th Cir. 2009); *United States v. Williams*, 731 F.3d 1222, 1236

---

[1] Jensen doesn't argue on appeal that the chats should have come into evidence under the rule of completeness, so he has forfeited this claim. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("A party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to [it]." (cleaned up)).

(11th Cir. 2013) (assuming, "without deciding," that the district court erred, and affirming because "any error by the district court during jury selection was harmless"). We will not disturb Jensen's convictions because the error of excluding the chats, if any, was harmless.

Under harmless error review, we ask whether an evidentiary error "had a substantial influence on the outcome of a case or left grave doubt as to whether [it] affected the outcome of a case." *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (cleaned up). We will not reverse a conviction "if the error had no substantial influence on the verdict and there was sufficient evidence to support the verdict apart from the error." *United States v. Martinez*, 700 F.2d 1358, 1367 (11th Cir. 1983).

Jensen argues that the exclusion of the chats was harmful because they "would have directly"—and convincingly—"contradicted" the government's position that he thought "Nicky" was real, and because the chats that the district court did allow into evidence failed to "demonstrate the depth and extent" of his online "roleplaying." We disagree for two reasons.

First, the exclusion of the chats did not have a substantial influence on the outcome of the case. The chats were either irrelevant, outright incriminating, or cumulative.

As to the irrelevant parts of the chats, many of them had nothing to do with Jensen's roleplay defense. Large portions of the chats included: (1) alerts from Motherless.com informing Jensen

that his "uploads" had been approved; (2) dozens of notifications awarding Jensen "credits"[2] for his posts; and (3) numerous alerts welcoming Jensen to various Motherless.com "groups," such as "Young Teen Lovers" and "West Georgia Sluts." These chats had no bearing on Jensen's claim that he knew "Nicky" wasn't a real child and was just roleplaying. They were therefore irrelevant. The exclusion of irrelevant evidence did not have a substantial influence on the outcome of the case. *See United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989) ("[I]t is axiomatic that a defendant's right to present a full defense does not entitle him to place before the jury irrelevant . . . evidence.").

As to the incriminating parts of the chats, one of the "groups" that Jensen joined in May 2015 was called "Young Teen Lovers." Jensen's membership in this group contradicted his testimony that he was "not at all" interested in sex with minors. And in numerous chats with other users, Jensen expressed an interest in meeting them in person. He told multiple users that he owned a house in, or otherwise often visited, their area. Jensen told one person that "I see we are both in Georgia" and suggested they "have some fun together." Jensen's proximity to other users was irrelevant if he merely intended to chat with them online; it was only relevant if he was seeking an in-person encounter. The

---

[2] Jensen's counsel explained during one of the midtrial bench conferences that Motherless.com had an "award system" giving users "credit[s]" for "essentially being dirty on the Internet."

exclusion of evidence corroborating Jensen's sexual interest in minors and his desire to meet people he met online for sexual encounters did not have a substantial influence on the outcome of the case. If anything, the exclusion of this evidence helped Jensen.

As to the cumulative parts of the chats, they included Jensen's Motherless.com profile page, in which he expressed his "love" for everything "taboo and dirty" and his desire to "meet another [M]otherless member." They also included Jensen's conversations on Motherless.com with "Rachel." This evidence had already been admitted during the government's case.

The chat logs were also cumulative to Jensen's trial testimony. He testified that his pornography addiction led him to Motherless.com. He said that the website had a "membership community" that he "enjoyed chatting with" because the other users "were just as deviant and disgusting as the pornography [he] was watching." According to Jensen, he engaged in "role[]play" and "fantasy chats" with people on the website. The "more deviant, the more depraved, the more messed up" the fantasies were the better, Jensen said, because he "could not have a normal fantasy chat and get excited."

To support his roleplay defense, Jensen described his chats in detail. He explained that he was "communicating with a lot of different users on" Motherless.com and not just with "Rachel." Jensen said that he would "reach out to someone based on whatever interest they had" in their profile, and there "was a lot of incest chat" and roleplay of various forms, like "age play" where

"someone likes to pretend to be a child." At the same time that he was chatting with "Rachel," he said, he was telling other "people online on the same website that [he] [was] having sex with [his] sister," even though his incest claims were made up. The excluded chats where Jensen shared his deviant sexual fantasies with other users were cumulative to Jensen's testimony describing those chats.

Finally, the excluded chats were cumulative to the chats that the district court allowed into evidence. The jury saw two pages of the chats, which consisted of a lengthy message Jensen sent to another user describing in graphic detail various incestuous sexual encounters Jensen allegedly had with his sister and cousin when they were children. To show that this was just fantasy roleplay, Jensen and his sisters testified that no incest had actually occurred. Critically, the chats about Jensen's incestuous encounters were far more elaborate than the other chats excluded from evidence. Thus, the jury saw the chats that best supported Jensen's roleplay defense—and nevertheless rejected his defense.

In short, the excluded chats were cumulative to the conversations between Jensen and "Rachel," cumulative to Jensen's trial testimony, and cumulative to the chats in evidence. The exclusion of cumulative evidence did not have a substantial influence on the outcome of the case. *See Dallas v. Warden*, 964 F.3d 1285, 1310 (11th Cir. 2020) ("[N]o prejudice can result from the exclusion of cumulative evidence." (citation omitted)).

Now for the second reason why the error, if any, in excluding the chats was harmless. Any error was harmless because there was more than enough evidence to support the verdict regardless of the alleged error. Jensen cannot establish harmful error in the face of the overwhelming evidence of his guilt. *See United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) ("Overwhelming evidence of guilt is one factor that may be considered in finding harmless error.").

Most of the evidence in this case came from Jensen himself. He repeatedly messaged "Rachel" on Motherless.com, believing she was looking to teach her underage daughter "Nicky" about sex. Jensen was "definitely open to doing that" and thought it would be "a great experience." He said that he had "trained" two other girls and would be a "very good teacher" for "Nicky." As the plan for Jensen to "train" Nicky developed, he left no doubt about what he planned to do with "Nicky." Jensen told "Rachel" that it was important for "Nicky" to learn how to "stroke and suck a cock," how to "swallow cum," and "of course how to fuck and get fucked." He also said that he would "like to try kinkier more taboo things" with the child, like "anal play" and "water sports," if "Rachel" thought "it would be good for her to learn stuff like that."

Jensen's communications with "Rachel" were not limited to describing the sex acts that he fantasized about inflicting on "Nicky." Rather, he made preparations to see "Nicky" in person to fulfill his desires. Jensen told "Rachel" that he wanted to see "Nicky" "in the next month or so." He proposed to babysit "Nicky"

as "mommy's friend" as a prelude to sex.  He emailed "Nicky" to introduce himself before his visit, and texted her that he "may be coming down to see [her] next week" to teach her about sex.  In response to "Rachel's" refusal to prove that "Nicky" was real by sending a photo of them together or letting her appear naked on a webcam, Jensen insisted that he "definitely want[ed] to do this" and promised to book his flight.  The evidence showed that Jensen didn't just fantasize about having sex with a child.  He planned to make it happen.

Jensen also knew that what he was doing was wrong and illegal.  He tried to convince "Rachel" to use a different chat platform because Motherless.com "frowned upon" what they were discussing.  He asked for photos of her with "Nicky" and for "Nicky" to appear naked on camera for his "own protection" because he was taking a "huge risk" over their "very illegal" plan.  Although Jenson acknowledged twice that his plan to have sex with a child was "very illegal," he was still "very happy and willing to do it."  And several weeks after Jensen discovered who "Rachel" really was, he performed an internet search for "[h]ow to erase [a] hard drive."  These incriminating admissions and actions were direct proof of Jensen's criminal intent, his sincere belief that Nicky was real, and his consciousness of guilt.  *See United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir. 1982) ("It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and

related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (cleaned up)).

Jensen's backpedaling after he discovered that "Rachel" was Special Agent Botterbusch further proved his guilt. "A false explanatory statement may be viewed by a jury as substantive evidence tending to prove guilt." *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir. 1984). Here, after discovering Special Agent Botterbusch's real identity, Jensen told "Rachel" that his messages were "just fantasy play" and he knew that "Nicky" wasn't real. Jensen then called Special Agent Botterbusch and claimed to be an "author" "working on a book." He maintained that his chats with her were research and he wanted to interview her. But Jensen admitted at trial that there was no book. Jensen's lies to explain his attempts to entice a minor further established his guilt. *See United States v. Holbert*, 578 F.2d 128, 130 (5th Cir. 1978) ("When a defendant voluntarily and intentionally offers an explanation and this explanation is later shown to be false, the jury may consider whether the circumstantial evidence points to a consciousness of guilt . . . .").

The government's rule 404(b) evidence was additional proof of Jensen's criminal intent. A forensic analysis of Jensen's devices revealed that he looked at pornography on Motherless.com with titles related to underaged girls like "[f]ather daughter anal sex." Jensen also used Kik, a chat application associated with the child pornography trade, to look at profiles belonging to young girls. This collateral evidence showed that Jensen had the intent to

commit the charged crimes. *See United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998) ("A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying [r]ule 404(b) evidence . . . .").

Finally, Jensen testified at trial that he was engaging in roleplay and fantasy chats, that he did not believe that "Rachel" and "Nicky" were real, and that he had no sexual interest in children. "This unimpressive account of events by" Jensen "constitute[d] substantive evidence of [his] guilt. This is so because a jury is free to disbelieve a defendant's testimony and consider it as substantive evidence of the latter's guilt." *See United States v. Rivera*, 780 F.3d 1084, 1098 (11th Cir. 2015). Given the implausibility of Jensen's testimony, his disavowal of his research book, and the jury's verdict of guilty, "one can reasonably infer that the jury so interpreted his testimony." *See id.*

In sum, the evidence against Jensen was overwhelming. Overwhelming evidence of guilt, in turn, weighs against a finding of harmful error. *Guzman*, 167 F.3d at 1353; *see also United States v. Phaknikone*, 605 F.3d 1099, 1111 (11th Cir. 2010) ("Viewed in its totality, the evidence of [the defendant's] guilt is overwhelming, and there is no reason to think that the [evidentiary error] had a substantial or injurious effect in influencing the jury.").

★ ★ ★ ★

Because excluding the chats did not have a substantial influence on the outcome of the case and because there was overwhelming evidence of Jensen's guilt, we conclude that the error, if any, was harmless.

### Jensen's Right to Present a Defense

Jensen argues that, for three reasons, the exclusion of the chats also violated his constitutional right to present a defense under the Fifth and Sixth Amendments. First, he contends that the excluded chats undermined the government's proof that he "had the intent to commit the charged offenses" because they showed that Jensen was just engaging in "virtual fantasies." Second, Jensen argues that he had a constitutional right to rebut the government's rule 404(b) evidence—proof that Jensen (1) visited pornography on Motherless.com that was, in the district court's words, "related to teens or young girls," and (2) viewed the profiles of children on Kik—by showing "the 'other side'" of his "online activities." And third, Jensen argues that the excluded chats were necessary to place the government's story in a "different light."

"Implicit in a criminal defendant's constitutional rights under the Fifth and Sixth Amendments is the right to present evidence in his or her favor." *United States v. Machado*, 886 F.3d 1070, 1085 (11th Cir. 2018). "[T]wo considerations are appropriate in analyzing a defendant's claim that his constitutional right to present a defense was violated: (1) whether the right was 'actually violated,' and (2) if so, 'whether [the] error was 'harmless beyond a

reasonable doubt.'"[3] *United States v. Akwuba*, 7 F.4th 1299, 1312 (11th Cir. 2021) (quoting *United States v. Hurn*, 368 F.3d 1359, 1362–63 (11th Cir. 2004)).  Where a defendant's constitutional right to present a defense was not actually violated, "we need not reach the second step of this analysis."  *Hurn*, 368 F.3d at 1363.

Jensen's constitutional claim fails because the district court did not actually violate his right to present a complete defense. Where the district court "permits a defendant to present the essence of [his] desired argument to the jury, [his] right to present a complete defense has not been prejudiced."  *Akwuba*, 7 F.4th at 1312 (quoting *United States v. Harris*, 916 F.3d 948, 959 (11th Cir. 2019)).  That is what happened here.

Jensen testified about his defense theory at length, told the jury that he was just engaging in fantasy roleplay, and maintained that he did not believe that "Nicky" was a real child.  Both of Jensen's sisters testified that they never engaged in incest with  him, corroborating his theory that the things he said to other users on Motherless.com weren't true. The defense also introduced into evidence Jensen's lengthy chats about his supposed childhood

---

[3] The government argues that we should review Jensen's constitutional claim for plain error because he did not argue that the exclusion of the chats would result "in a constitutional violation."  But Jensen did argue that the exclusion of the chats "prohibit[ed] [him] from pursuing [his] theory of defense."  We will assume, without deciding, that this objection was enough to preserve the constitutional claim.

experiences with incest, giving the jury a concrete example of the fictitious roleplaying Jensen sought out online.  Finally, Jensen's counsel began his closing argument by quoting the incest chats at length—the quote spans four pages of the trial transcript—to underscore the defense's theory that everything Jensen told Special Agent Botterbusch was "complete and utter garbage."

The defense's evidence and argument did the three things that Jensen hoped to achieve with the excluded chats.  The evidence offered to support his roleplay defense—Jensen's testimony, his sisters' testimony, and the incest chats—undermined the government's proof that Jensen intended to commit the offenses, rebutted the government's rule 404(b) evidence, and placed the government's case in a different light.  Jensen wasn't prevented from giving the jury a complete roleplay defense.  The jury simply rejected his defense.  *See United States v. Stahlman*, 934 F.3d 1199, 1225–26 (11th Cir. 2019) ("[The defendant] protests that there is an innocent explanation for all of this conduct—namely, that the entire thing was a big misunderstanding, as he believed he was conversing with an adult couple as part of a fantasy role[]playing scenario, and not with the father of an actual [eleven]-year-old girl.  The problem for [him] is that the jury was not required to accept this innocent explanation.").

Because the district court permitted Jensen "to present the essence of [his] desired argument to the jury, [his] right to present a complete defense" was not "prejudiced."  *See Akwuba*, 7 F.4th at 1312.  And because Jensen's right to present a defense was not

"actually violated," the exclusion of the chats did not violate Jensen's constitutional rights. *See Hurn*, 368 F.3d at 1362. We therefore need not proceed to the second step—harmless error review—because there was no constitutional error. *Id.* at 1363.

### The Jury Instructions

Finally, Jensen brings two challenges to the jury instructions. First, he argues that the district court plainly erred by constructively amending the interstate commerce element for both counts. The district court did so, Jensen contends, because the indictment charged him with violating the interstate commerce elements through his use of a "computer," but the district court instructed the jury that it could convict Jensen for his use of a "cellular telephone" or the "Internet." Second, Jensen argues that the district court plainly erred as to count one by misstating the intent and substantial step elements. We conclude that the error, if any, was invited by Jensen.

"The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998). "Where a party invites error," we are "precluded from reviewing that error on appeal." *United States v. Harris*, 443 F.3d 822, 823–24 (11th Cir. 2006). Although "failing to object does not trigger the doctrine," *United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012), "when a party agrees with a court's proposed [jury] instructions, the doctrine . . . applies, meaning that review is waived," *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010).

Here, Jensen did more than just fail to object to the jury instructions. He did not propose his own instructions, and when the district court asked his counsel whether he had looked at the government's proposed instructions, his counsel replied that he had and that he had "[n]o objection" to them. Because Jensen invited the district court to use the jury instructions at issue, he cannot challenge them now. *See United States v. Feldman*, 931 F.3d 1245, 1260 (11th Cir. 2019) ("Under our precedent, 'when a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result.'" (citation omitted)); *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005) ("When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." (citation omitted)); *United States v. Fulford*, 267 F.3d 1241, 1246–47 (11th Cir. 2001) (applying the invited error doctrine to a supplemental jury instruction where defense counsel said that the instruction was acceptable).

Relying on our recent decision in *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022) (en banc), Jensen maintains that the error wasn't invited because his counsel's "routine statement" was not "an intentional waiver of [Jensen's] rights." We disagree. We explained in *Campbell* that there is "a distinction between waived issues and forfeited issues." *Id.* at 872. "[F]orfeiture is the failure to make the timely assertion of a right; waiver is the intentional

relinquishment or abandonment of a known right." *Id.* (citation omitted).

Here, Jensen's counsel did not just fail to make a timely objection to the jury instructions; he intentionally and affirmatively voiced his agreement with the instructions. This is a waiver on Jensen's part, not a forfeiture, to any challenge to the jury instructions in this case. *See id.*; *Feldman*, 931 F.3d at 1260. Because Jensen invited any errors arising from the jury instructions, we are precluded from reviewing the issue. *See Harris*, 443 F.3d at 823–24.

## CONCLUSION

We conclude that any evidentiary error in the exclusion of the chats was harmless, the exclusion of the chats did not violate Jensen's constitutional right to present a defense, and Jensen invited any errors in the jury instructions. Finding no reversible error, we affirm Jensen's conviction.

**AFFIRMED.**